NANCY K. BRENNICK ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF NEWINGTON ET AL.

SUPERIOR COURT      JUDICIAL DISTRICT OF      FILE NO. 360700
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed March 19, 1991

*McVane, Bellobuono & Kuzmak,* for the plaintiffs.

*Thomas P. Byrne,* for the named defendant.

*Rogin, Nassau, Caplan, Lassman & Hirtle,* for the defendants Clifford F. Stamm and Newell A. Stamm.

HAMMER, J. The plaintiffs have taken this appeal from a decision of the defendant planning and zoning commission of the town of Newington (commission) rezoning a 17.9 acre parcel of land on the eastern side of Kitts Lane in Newington, owned by the defendants Clifford F. Stamm and Newell A. Stamm, from Business Berlin Turnpike (B-BT) to Planned Development (PD). The

plaintiffs have also appealed the commission's decision to grant a special exception permitting the Stamms to build four high-rise residential apartment buildings pursuant to the zoning regulations for PD zones.

As stated in their brief, the plaintiffs' grounds for their appeal are that the project is inconsistent with the town's plan of development and the character of the area, that there is no need for high-rise apartment buildings in that location, and that the proposed development will increase the area's traffic congestion and create traffic safety problems.

The plaintiffs offered evidence of aggrievement at the hearing which established that the named plaintiff as well as Edward N. Martin and Carol Martin and David A. Gordon and Danuta M. Gordon own property within a radius of 100 feet of the Stamms' property. General Statutes § 8-8 (1). The court finds that these plaintiffs are aggrieved by virtue of the statute and that they, therefore, have standing to prosecute this appeal. See *Smith* v. *Planning & Zoning Board,* 203 Conn. 317, 321, 524 A.2d 1128 (1987).

The plaintiffs' first claim is that there is no evidence in the record to support the commission's conclusion that the Stamms parcel's existing B-BT designation should be changed to PD. They argue that the approvals given for the zone change and the special exception for the high-rise apartment buildings are inconsistent with the town's plan of development adopted in 1984, which, they claim, did not consider the property appropriate for designation as a PD zone.

The plaintiffs also assert that the commission's action in the present case is inconsistent with its denial, in 1986, of a previous application for a similar special exception in an existing PD zone because the plan of development did not identify the proposed location as a suitable site for high-rise apartments. They argue that

there is no evidence in the record that could reasonably support a different conclusion regarding the application by the Stamms.

A master plan or plan of development is the planning commission's recommendation for the most desirable uses of land and, because it is merely advisory, it does not control the zoning commission in its enactment of zoning regulations. *Furtney* v. *Zoning Commission,* 159 Conn. 585, 598, 271 A.2d 319 (1970). The comprehensive plan, on the other hand, in accordance with which zoning regulations must be adopted, "is such a plan as the zoning commission devises"; *Levinsky* v. *Zoning Commission,* 144 Conn. 117, 123, 127 A.2d 822 (1956); and any change in the zone of a district necessarily results in a change in the comprehensive plan because that plan is to be found in the zoning regulations and the zoning maps themselves. *Mott's Realty Corporation* v. *Town Plan & Zoning Commission,* 152 Conn. 535, 540, 209 A.2d 179 (1965).

It is a function of zoning to balance "the preservation of the status quo with the reasonable pressures for change due to the growth in population . . . and community requirements," and the zoning authority must accomplish this through a logical development of its comprehensive plan. *Jablon* v. *Planning & Zoning Commission,* 157 Conn. 434, 443, 254 A.2d 914 (1969). When a zoning board amends its regulations, it acts in a legislative capacity and may exercise its legislative discretion to make such modifications "whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for a change." *Malafronte* v. *Planning & Zoning Board,* 155 Conn. 205, 209, 230 A.2d 606 (1967).

The applications, as originally submitted to the commission by the Stamms, proposed the construction of four ten story apartment buildings containing one hun-

dred units of elderly housing and 240 units of standard housing as well as 41,000 square feet of commercial and office space. The first application requested that the entire parcel be rezoned to PD, a zone that permits high-rise apartments by special exception for which approval was requested in a second application filed at the same time.

On January 25, 1989, and on February 8, 1989, public hearings were held on all of the applications for which approvals were required. A special meeting of the commission was held on March 15, 1989, to discuss the evidence offered at the public hearings as well as the report and recommendations of the town planner, Edward Meehan. On March 22, 1989, the commission unanimously voted to approve the zone change and the special exception.

The first reason given by the commission for its approval was that the rezoning of the Stamms' property is consistent with the policies and goals of the town plan of development, which are to encourage mixed residential/commercial uses and "a variety of housing types to meet housing needs for elderly, young couples and singles." Another reason stated by the commission for its decision was that the PD zone's design standards and special exception procedures "are more restrictive and will allow the commission more control when deciding future land uses."

The plaintiffs argue in their brief that although the development as proposed may meet a perceived public need for high density residential housing in an already existing PD zone, there is no justification for a change in zone that will eliminate "one of the few areas of B-BT zone" available for development. They also point out that "[t]he subject site abuts or is within yards of a major trucking terminal, a heavy construction equipment sales and service business and an

automotive major collision repair business [which] uses are hardly compatible with the proposed residential development."

The plaintiffs' argument overlooks the other reasons stated by the commission for its approval of the zone change, including the fact that the Stamms' parcel has no frontage on the Berlin Turnpike and that "the PD Zone may permit the development of higher density housing which could serve as a transitional land use between Berlin Turnpike commercial uses and the residential neighborhoods of Harold Drive, Ledgecrest and Settler's Knoll." An additional reason given by the commission for its approval of the zone change application was that it "provides for a continuity of land use with the adjacent PD Zone across the street, westside of Kitts Lane."

The fact that the property has no frontage on the Berlin Turnpike was discussed with the commission at its meeting of March 15, 1989, by Meehan, the town planner. He stated that the "Berlin Turnpike Zone is essentially all the frontage of the Berlin Turnpike," and that the proposed site on Kitts Lane was "the one exception where parcels which are zoned for Berlin Turnpike Business use don't have frontage on the Berlin Turnpike."

In the course of the same meeting, Meehan also explained the reasons for the conclusion in his staff report of January 20, 1989, that the proposed rezoning would be consistent with the "future land use objectives and policies for housing and mixed use development" of the town's plan of development, even though that plan did not specifically designate the Kitts Lane parcel as a potential site for the high-rise residential uses proposed by the Stamms in their applications to the commission. He stated to the commission that

"the reason this 17 acre parcel wasn't identified specifically in the 1984 plan was that these parcels were not available for development in 1984."

Meehan also told the commission that, in his opinion, it was appropriate to have this type of residential development between the Berlin Turnpike, "a heavily traveled commercialized street . . . and a residential area as a buffer or transitional land use . . . ." Meehan also referred to the fact that the town plan recommends that the commission consider the need for expanding the variety and affordability of the housing supply in Newington, and that "there is certainly a need in the region for more rental housing stock," but that the decision to make the zone change was a policy decision that would have to be made by the commission acting legislatively, rather than administratively, as it would be doing in considering a special exception.

"The purpose of zoning is to serve the interests of the community as a whole, and one of those interests is to provide adequate housing [and a] change of zone predicated on such an interest, if otherwise consistent with the accepted principles of zoning, is a reasonable exercise of the board's discretionary powers." *Malafronte* v. *Planning & Zoning Board,* supra, 212. The zoning power of a municipality may properly be exercised to achieve the goal of access to affordable housing in order to meet present and prospective needs. *Holmdel Builders Assn.* v. *Township of Holmdel,* 121 N.J. 550, 567, 583 A.2d 277 (1990).

The legislature has recognized this aspect of the zoning power by providing that zoning regulations "shall also encourage the development of housing opportunities for all citizens of the municipality . . . ." General Statutes § 8-2. Evidence that there is a limited market of relatively affordable housing for young married couples and "empty nesters" is sufficient to sup-

port a finding that there is a need for a zone change to permit the construction of multifamily condominium units. *Blaker* v. *Planning & Zoning Commission,* 212 Conn. 471, 484, 562 A.2d 1093 (1989).

The members of a zoning commission are competent to determine whether a sufficient local demand exists to warrant the creation, continuance or elimination of a high density planned residential development. See *Central Bank for Savings* v. *Planning & Zoning Commission,* 13 Conn. App. 448, 455, 537 A.2d 510 (1988). The zoning commissioners, in making their determination, are not limited to the evidence that has been presented to them, but may also properly rely on their personal knowledge of the town's needs for multifamily housing. Id., 456.

Where a change of zone cannot be said to be inconsistent with the town's comprehensive plan for the good of the community as a whole, and the proposed amendment appears to be a logical and rational development of that plan, the zoning board will not be held to have abused its discretion where its action "involved a fairly debatable question which was within its province, acting in its legislative capacity, to resolve." *Dooley* v. *Town Plan & Zoning Commission,* 154 Conn. 470, 478, 226 A.2d 509 (1967). The controlling tests that the commission must apply are "whether the good of the community as a whole is served by the change and whether the change falls within the requirements of the comprehensive plan for the use and development of property in the municipality or a large part of it." *Zandri* v. *Zoning Commission,* 150 Conn. 646, 649, 192 A.2d 876 (1963).

For the foregoing reasons, the court finds that there is sufficient evidence in the record to support the commission's conclusion that the zone change from B-BT

to PD is consistent with the town's plan of development and with the character of the area in which the property is located.

The arguments made by the plaintiffs against the zone change are substantially the same ones they make regarding the legal and evidential sufficiency of the commission's grant of a special exception permitting the erection of three apartment buildings of six stories for "standard" housing and one of seven stories for elderly housing, making a total of 226 apartments instead of the 340 apartments that were originally proposed. They also claim that the approval of the special exception in the present case is inconsistent with the denial of a prior application for high-rise apartments in an existing PD zone and with the approval of 285 units within one mile of Kitts Lane, which units have not yet been built.

The plaintiffs, in making these claims, overlook the obvious fact that the sole purpose of the application for the zone change, and the principal reason for the commission's decision to rezone the property, was to permit some type of high-rise residential apartment complex to be constructed on the site. In effect, they are asking the court to overturn the commission's discretionary legislative action of zone change approval, which has been found by the court to have been reasonably exercised, by declaring the zoning authority's administrative implementation of that policy decision to be null and void.

A planned development zone is, by definition, a departure from conventional zoning restrictions and cannot, for that reason alone, warrant judicial intervention in the legislative determination of the zoning authority that it should be allowed in that particular location. *Peabody* v. *Phoenix*, 14 Ariz. App. 576, 580, 485 P.2d 565 (1971). The exclusive standards to be applied in

such a zone are those contained in the section of the regulations that permits them and imposes restrictions and conditions before such a project may proceed. *Michaels Development Co.* v. *Benzinger Township Board,* 50 Pa. Commw. 281, 413 A.2d 743, 747 (1980).

The reasons given by the commission for its approval of the special exception include its findings that the development of "this site" for commercial/residential uses is consistent with the policies of the town plan to foster mixed uses and to provide additional housing variety, and that it will establish an area of residential land uses that is compatible with the adjacent residential area. The commission also found that the presence of a ridge line and the topographic difference of the site from the adjacent residential areas were sufficient to permit taller residential building and that there was enough distance between the two areas for a natural buffer and new planned landscaping "to safeguard adjacent properties from detriment."

The commission also found that the proposed apartment buildings "will not substantially increase school enrollment or place a burden on municipal services." Finally, it concluded that "the movement of traffic within the site is properly designed [and that additional] vehicle trips generated by this development will be reviewed by the State Traffic Commission and in coordination with the local Traffic Authority any necessary road improvements shall be the responsibility of the developer."

The court concludes that the above findings comply with the general requirements of § 5.2 of the Newington zoning regulations for the granting of special exceptions and with the specific requirements of § 3.18 of the regulations for PD zones.

The plaintiffs' final claim is that the proposed development will "cause circulation problems on existing

streets and increase traffic congestion, and that there is no reasonable basis in the record to support a conclusion that "this development lessens the congestion in the streets or is in the best interests of public safety." They rely principally on the fact "[t]hat there was considerable informed opposition to this proposal by both property abutters and residents from other areas in Newington" who voiced their objections and expressed their concerns on this issue at the public hearings.

The traffic report prepared by the Stamms' traffic engineer concluded that "the Newington Heights development can accommodate the increase in traffic volumes to be anticipated from the proposed development." The town planner, in a report dated February 3, 1989, noted that the 17 percent reduction in the number of apartment units would result in a proportionate decrease in traffic and that although "lane improvements and signal adjustments should still be implemented," the Berlin Turnpike "has adequate capacity to accommodate the additional vehicles generated by this project."

A zoning board, like any other administrative board or agency, may determine for itself the weight it will give to the evidence it receives in the form of oral testimony or any materials or statistical data that are presented on any particular issue; see *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 542, 525 A.2d 940 (1987); and, although it may have heard evidence to the contrary, it is not required to explain why it valued one witness or statistic over another. *Daro Realty* v. *District of Columbia Zoning,* 581 A.2d 295, 302 (D.C. 1990). The record on this appeal fully supports the conclusion reached by the commission on the issue of traffic impact even though it was conditioned on further improvements for which the developer was to be responsible. See *Stiles* v. *Town Council,* 159 Conn. 212, 220, 268 A.2d 395 (1970).

For the foregoing reasons, the court finds that the commission did not act illegally, arbitrarily, or in abuse of its legislative or administrative discretion in granting the various applications presented to it by the defendants Clifford F. Stamm and Newell A. Stamm.

Accordingly, the plaintiffs' appeal is dismissed.